**Elizabeth CHANICKA, Plaintiff,**

**v.**

**JETBLUE AIRWAYS CORPORATION and Metropolitan Life Insurance Company, Defendants.**

**15–CV–6959 (WFK) (RLM)**

United States District Court, E.D. New York.

Signed March 20, 2017

Filed March 21, 2017

Matthew Ian Marks, Ricotta & Marks, P.C., Long Island City, NY, Thomas Ricotta, White Ricotta & Marks, P.C., Jackson Heights, NY, for Plaintiff.

Christopher Rocco Lepore, Matthew Adam Steinberg, Akerman LLP, New York, NY, Randi F. Knepper, McElroy, Deutsch, Mulvaney & Carpenter, LLP, Morristown, NJ, Colleen M. Duffy, McElroy, Deutsch, Mulvaney & Carpenter, Newark, NJ, for Defendants.

## DECISION AND ORDER

WILLIAM F. KUNTZ, II, United States District Judge:

Defendant Metropolitan Life Insurance Company ("MetLife") moves to dismiss plaintiff Elizabeth Chanicka's ("Plaintiff") complaint against it under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). This action arises out of Plaintiff's termination from her employment at JetBlue Airways Corporation ("JetBlue") after having taken leave from under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq. ("FMLA"). JetBlue's FMLA leave program was administered by MetLife, who Plaintiff alleges tortiously interfered with her relationship with JetBlue by misrepresenting her absences and her adherence to MetLife and JetBlue's FMLA policies, which resulted in her termination from

JetBlue. For the reasons set forth below, MetLife's motion to dismiss is GRANTED.

## BACKGROUND [1]

Plaintiff is a former JetBlue employee who was terminated in 2015 for alleged "FMLA abuse." Compl. ¶¶ 34–37, ECF No. 1. Plaintiff had worked for JetBlue since 2004 and had been granted several periods of FMLA leave during her employment, as she was the primary caregiver for her mother and her son, both of whom had serious medical issues. *Id.* ¶¶ 7, 10–18. Beginning in 2011, Plaintiff had been certified to take "intermittent FMLA leave," as needed, to care for both her mother and her son. *Id.* ¶¶ 12, 15.

Toward the end of 2012, JetBlue hired MetLife to administer its FMLA leave program. *Id.* ¶ 16. Shortly thereafter, MetLife implemented a new "call out" process for employees who needed to take off from work on a given day to care for themselves or a family member and wanted that day to be counted as intermittent FMLA leave. *Id.* Specifically, the process requires JetBlue employees to call their managers on the days they take off and to then call MetLife within seven days to use intermittent FMLA leave for that day. *Id.* MetLife then sends the employees a letter confirming the day(s) taken off were approved as intermittent FMLA leave. *Id.* Prior to the implementation of MetLife's policy, employees only had to call their JetBlue managers to take a day off. *Id.*

In or around October 2013, Plaintiff received a "Progressive Guidance Report" ("PGR") at the "Final Guidance" step (the highest level of discipline prior to termination) from JetBlue for not properly following the FMLA call out process. *Id.* ¶ 17. In the PGR, JetBlue identified thirty instances between January 1, 2013, and August 28, 2013, when Plaintiff had failed properly to call out, although MetLife had documented calls from her on eight of those thirty days. *Id.* Plaintiff admitted she had made mistakes when attempting to adhere to the new call out policy but was told the PGR would be taken off of her record after six months. *Id.*

After receiving this warning, Plaintiff consistently adhered to the call-out policy, but MetLife made several mistakes in documenting her absences. *Id.* ¶ 18. Specifically, MetLife acknowledged making mistakes in the processing of her paperwork on three occasions and sent her a different employee's paperwork on another. *Id.* ¶¶ 19–22.

In August 2015, Plaintiff was called into a meeting with JetBlue managers who told her she had not been properly reporting her intermittent FMLA leave and cited specific dates when the procedure had not been followed. *Id.* ¶ 23. Plaintiff replied that she had been using the proper procedure and would follow up with MetLife regarding the dates in question. *Id.* MetLife later confirmed to Plaintiff it had recorded calls from her on all but one of the dates the JetBlue managers had mentioned. *Id.* ¶ 24. After Plaintiff provided JetBlue with this information, JetBlue gave Plaintiff an additional set of days it was investigating. *Id.* ¶ 24–25. Plaintiff contacted MetLife about these dates and was told a case manager would be assigned to research them. *Id.* ¶ 26.

Later that month, Plaintiff received an email from JetBlue informing her she had twenty-four hours to provide information about the leave under investigation or she would face discipline. *Id.* ¶ 27. Plaintiff responded that she had found letters from MetLife about some of the dates in ques-

1. For the purpose of resolving the motion to dismiss, the Court assumes all well-pleaded facts in the Complaint to be true, drawing all reasonable inferences in favor of Plaintiff. *Johnson v. Rowley,* 569 F.3d 40, 43 (2d Cir. 2009).

tion. *Id.* ¶ 28. She subsequently sent Jet-Blue an email that, *inter alia,* "highlighted several mistakes" MetLife had made in administering her intermittent FMLA leave. *Id.* ¶ 29. Shortly thereafter, Plaintiff was suspended without pay pending an investigation of her FMLA use, based on allegations that she failed to comply with the call out procedure and to have made false statements during the investigation. *Id.* ¶ 30. Plaintiff again submitted a letter that, among other things, detailed "several issues" she had had with MetLife as the administrator of JetBlue's leave policy. *Id.* ¶ 31. She subsequently received letters from MetLife acknowledging she had properly called in her absences for two more of the dates under investigation and forwarded these letters to JetBlue. *Id.* ¶ 32. In September 2015, Plaintiff was terminated from her position at JetBlue for "FMLA abuse." *Id.* ¶ 34. Plaintiff requested a post-termination review, where she "detailed the pattern of inconsistencies with MetLife's FMLA record keeping." *Id.* ¶ 36.

Plaintiff contends that "[b]ut for Met-Life's inability to record and/or maintain proper records," she would not have been terminated. *Id.* ¶ 37. She brings one cause of action against MetLife, which, although presented as a state law discrimination claim, appears to allege MetLife tortiously interfered with Plaintiff's relationship with JetBlue, resulting in her termination. *Id.* ¶¶ 43–47; *see also* Pl.'s Mem. Opp. Mot. Dismiss ("Opp.") at 1, ECF No. 23–4 (describing claim as "tortious interference with business relations").[2] Specifically, Plaintiff alleges that, at the time of her dismissal, she "had a reasonable expectancy of continuing her employment with Jet-Blue," and that "MetLife intentionally, wrongfully, and/or unjustifiably interfered

with" her employment with JetBlue, thereby "induc[ing]" her termination. Compl. ¶¶ 43–47. MetLife moved to dismiss Plaintiff's claim under Rule 12(b)(6) or, in the alternative, for judgment on the pleadings under Rule 12(c), on June 17, 2016. ECF No. 23.

## STANDARD OF REVIEW

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). In applying this standard, the Court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in [the plaintiff's] favor." *Johnson v. Rowley,* 569 F.3d 40, 43 (2d Cir. 2009) (per curiam) (citation omitted). The Court need not, however, credit "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal,* 556 U.S. at 663, 129 S.Ct. 1937). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss," and "[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (quoting *Iqbal,* 556 U.S. at 663–64, 129 S.Ct. 1937).

██ Alternatively, Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."

---

**2.** Plaintiff voluntarily dismissed her FMLA discrimination claim against MetLife on May

2, 2016. ECF No. 22.

The standard of review for a Rule 12(c) motion is the same as the standard for a Rule 12(b)(6) motion. *See Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010).

## ANALYSIS

### I. Tortious Interference with Business Relations

■ For the reasons below, this Court agrees with the clarification included in Plaintiff's briefing, which construes her claim as one for tortious interference with business relations (also referred to as prospective economic relations), and concludes the claim must be dismissed as insufficiently pleaded. Plaintiff does not allege she had an employment contract with Jet-Blue that provided for a fixed or definite term of employment. Therefore, she is presumed to be an at-will employee, as is the default under New York law. *See Baron v. Port Auth. of N.Y. & N.J.*, 271 F.3d 81, 85 (2d Cir. 2001) (noting the "presumption [of at will employment] can be rebutted . . . by establishing an 'express limitation in the individual contract of employment' curtailing an employer's right to terminate at will" (quoting *Gorrill v. Icelandair/Flugleidir*, 761 F.2d 847, 851 (2d Cir. 1985))). Accordingly, Plaintiff was in a "non-binding relationship" with JetBlue and her claim must be one for tortious interference with business relations rather than for interference with a contract, as there was no binding contract to be broken. *Lawrence v. Union of Orthodox Jewish Congregations of Am.*, 32 A.D.3d 304, 820 N.Y.S.2d 60, 60–61 (1st Dep't 2006); *see also Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.*, 455 Fed.Appx. 102, 104 (2d Cir. 2012) (affirming dismissal of tortious interference with contract claim where complaint did not "sufficiently allege[ ] the existence of a binding contract").

■ Plaintiff therefore faces a high burden with regard to pleading the nature of the alleged interference. "To state a claim for [tortious interference with business relations] under New York law, four conditions must be met: (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008) (citations omitted). The New York Court of Appeals undertook a comprehensive analysis of this cause of action in *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 785 N.Y.S.2d 359, 818 N.E.2d 1100 (2004) ("*Carvel II*"), after the Second Circuit certified questions regarding "the standard by which [a court] should evaluate [a defendant's] conduct for purposes of imposing liability for tortious interference" to it, *Carvel Corp. v. Noonan*, 350 F.3d 6, 8 (2d Cir. 2003) ("*Carvel I*"). The *Carvel II* court found the principal distinction between tortious interference with contract versus business relations concerned the conduct that satisfies the third element, which requires the defendant to have acted "for a wrongful purpose" or to have used "improper means." *Carvel II*, 3 N.Y.3d at 189–90, 785 N.Y.S.2d 359, 818 N.E.2d 1100.

Specifically, the *Carvel II* court found that, although "a defendant who induced the breach of a binding contract could be liable 'even if the defendant was engaged in lawful behavior,'" *id.* at 190, 785 N.Y.S.2d 359, 818 N.E.2d 1100 (quoting *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 87 N.Y.2d 614, 621, 641 N.Y.S.2d 581, 664 N.E.2d 492 (1996)), "[c]onduct that is not criminal or tortious will generally be 'lawful' and thus insufficiently 'culpable' to create liability for interference with prospective contracts or

other nonbinding economic relations," *id.* The sole exception to this general rule, the court noted, is where "a defendant engages in conduct 'for the sole purpose of inflicting intentional harm on plaintiffs.'" *Id.* (quoting *NBT Bancorp, Inc. v. Fleet/Norstar Fin. Group, Inc.*, 215 A.D.2d 990, 990, 628 N.Y.S.2d 408 (3d Dep't 1995), *aff'd*, 87 N.Y.2d 614, 641 N.Y.S.2d 581, 664 N.E.2d 492 (1996)). The *Carvel II* court also acknowledged there may be conduct "so culpable" or "egregious" it could be the basis for a claim of tortious interference with business relations, but it did not find such conduct to be present in that case, where the Carvel ice cream company was alleged to have undermined the businesses of its franchisors by directly marketing its products to supermarkets. *Id.* at 187–88, 190–91, 785 N.Y.S.2d 359, 818 N.E.2d 1100.

MetLife contends, and this Court agrees, Plaintiff has not pleaded any unlawful, tortious, or intentional conduct by MetLife that would satisfy the standard set forth in *Carvel II*. Rather, Plaintiff has pleaded that MetLife made a series of "mistakes" and "errors" in maintaining its paperwork and reporting on her use of intermittent FMLA leave. Compl. ¶¶ 18–22. Although Plaintiff attempts to recast these mistakes in her briefing as "knowing[ ] ... misrepresentations" and "intentionally false[ ] report[s]" made by MetLife to JetBlue, Opp. at 6–7, the allegations in the Complaint do not allow this Court to infer that MetLife took any intentional actions to interfere with Plaintiff's employment by misrepresenting her absences and actions to JetBlue. Rather, the Complaint merely indicates MetLife made several mistakes in administering Plaintiff's leave and attempted to rectify them when they were discovered. This poor performance does not rise to the level of the culpable conduct the *Carvel II* court suggested could support a claim for tortious interference with business relations, which included "physical violence,

fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure." *Carvel II*, 3 N.Y.3d at 191, 785 N.Y.S.2d 359, 818 N.E.2d 1100 (quoting *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 191, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980)); *see also Watson v. Riptide Worldwide, Inc.*, 11–CV–0874, 2012 WL 383946, at *7 (S.D.N.Y. Feb. 7, 2012) (Crotty, J.) (finding claims of "negligent[ ] mismanag[ement]" of business operations "[fell] short of the level of culpability" required to state a claim for tortious interference with prospective economic advantage).

Plaintiff's reliance on *Arango v. Work & Well, Inc.*, 930 F.Supp.2d 940 (N.D. Ill. 2013), is unavailing. In *Arango*, an Illinois district court allowed a tortious interference with contract claim to proceed against the third-party administrator of an employer's FMLA leave plan where the administrator, Work & Well, Inc. ("W&W"), had specifically marketed its services by promising to reduce the usage of FMLA leave by, *inter alia*, requiring employees to submit documentation of their need for FMLA leave every four to six weeks, even if they could demonstrate at the outset they were entitled to more leave. *Id.* at 944–45. The plaintiff in *Arango* alleged W&W had required him to recertify his FMLA after four weeks even though he had already demonstrated he was entitled to eight weeks of leave, which resulted in his termination after his doctor did not timely submit the second set of documents. *Id.* at 945–46. The *Arango* court found that W&W, in requiring the plaintiff to submit such unnecessary documentation (which was, notably, in violation of the FMLA itself), had acted consistently with its marketing materials and consequently had "intentionally denied meritorious FMLA leave requests to enhance its reputation as a benefits administrator and increase its

book of business." *Id.* at 946. Accordingly, the court allowed the plaintiff's tortious interference claim to proceed, as W&W had not established that it had acted in good faith such that the so-called "consultant's privilege," under which "a consultant, or other advisor, [is privileged] to offer good-faith advice to a client without fear of liability [for tortious interference] should the client act on that advice to the harm of a third person," might apply. *Id.* at 944, 946 (quoting *J.D. Edwards & Co. v. Podany*, 168 F.3d 1020, 1022 (7th Cir. 1999) (alterations in original)).

*Arango* is clearly distinguishable from the instant case. While the *Arango* court specifically found that W&W had intentionally acted to interfere with the plaintiff's use of his FMLA leave and thereby created the conditions that caused the plaintiff to be fired, no such intentional conduct is pleaded here. Rather, Plaintiff pleads, at most, that MetLife was inept. Further, *Arango* involved a tortious interference of contract, rather than business relations, claim that was not decided under New York law and therefore does not bear upon whether W&W's conduct would satisfy the standard of culpability set forth in *Carvel II*. Accordingly, *Arango* is not relevant to the question of whether MetLife's allegedly negligent conduct does so.

Plaintiff also encourages this Court to recognize a new exception "to the general rule that defendants [sic] conduct must amount to a crime or independent tort" for "tortious interference claims against third-party FMLA leave administrators." Opp. at 9. Otherwise, Plaintiff argues, a "legal loophole would be created" under which employees would have no recourse as to FMLA determinations made by third-party administrators where their employers relied on those determinations in good faith and had "reasonable grounds" for doing so, thus sheltering the employers from liquidated damages under the FMLA. *Id.* at 8; *see also* 29 U.S.C. § 2617(a)(1)(A)(iii) (allowing courts, in their discretion, to exempt employers from liquidated damages where "an employer ... proves to the satisfaction of the court that the [violative] act or omission ... was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation").

■ This argument is unpersuasive. As Plaintiff admits, the FMLA only shields employers from liquidated damages when they rely in good faith on decisions made by third-party administrators. Employers may still be liable for damages equal to the value of "wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation" or any "actual monetary losses sustained by the employee as a direct result of the violation," plus interest on those amounts. 29 U.S.C. § 2617(a)(1)(A)(i) & (ii). Indeed, an employer's rationale for denying FMLA leave is irrelevant where an employee alleges her FMLA rights have been interfered with, *see Geromanos v. Columbia Univ.*, 322 F.Supp.2d 420, 427 (S.D.N.Y. 2004) (McMahon, J.) (enumerating elements of FMLA interference claims), and courts have found employers may be held accountable under the FMLA where employees' claims arose, in whole or in part, out of actions taken by third-party administrators of FMLA leave, *see, e.g., Ridgeway v. Royal Bank of Scotland Grp.*, 11–CV–976, 2012 WL 1033532, at *8–10 (D. Conn. Mar. 27, 2012) (denying motion to dismiss FMLA claims against employer where employer and third-party administrator provided plaintiff conflicting information about leave). Accordingly, there is no basis for this Court to find that, absent the creation of an exception not recognized in *Carvel II*, employers will be shielded from liability for actions taken by their third-party FMLA administrators, much

less be motivated to hire incompetent ones, as MetLife is purported to be. This seems particularly unlikely where, as here, an employer is alleged to have been confronted with the administrator's mistakes before deciding to terminate the employee, as such termination would ostensibly not have been in "good faith."

Further, regulations issued under the FMLA expressly shield third-party administrators and other Professional Employer Organizations from liability where they perform only administrative tasks, including regulatory paperwork, and do not have the "right to hire, fire, assign, or direct and control the client's employees" such that they would be joint employers. 29 C.F.R. § 825.106(b)(2). This Court will not subvert this regulatory scheme and create liability where the administering agency clearly intended none be created. *Cf. Grochowski v. Phoenix Const.*, 318 F.3d 80, 86 (2d Cir. 2003) (rejecting state law contract claims seeking to enforce federal statute that provided no private cause of action as an "impermissible 'end run' around" the limitations of the statutory scheme). MetLife's motion to dismiss Plaintiff's claim is therefore GRANTED. As such, this Court does not need to reach MetLife's contention that the so-called "consultant's exception" should apply in this instance.

## II. Plaintiff's Request to Amend Her Pleadings

Plaintiff seeks leave to amend her pleadings should her claims against MetLife be dismissed. This is not an appropriate motion to amend. Plaintiff may hereafter move to do so by following the procedures outlined by Federal Rule of Civil Procedure 15(a)(2) and this Court's rules, at which time the Court will consider the proposed amendment. *Cf. In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 220 (2d Cir. 2006) ("[W]here amendment would be futile, denial of leave to amend is proper.").

## CONCLUSION

For the foregoing reasons, MetLife's motion to dismiss is GRANTED.

**SO ORDERED.**